## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHAWN KENNY**, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-03299 (TNM) |
| **ISLAMIC REPUBLIC OF IRAN**, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

In early 2018, terrorists attacked the Intercontinental Hotel in Afghanistan. They killed and wounded dozens of individuals, including several Americans, during a blitz that lasted for hours. The Taliban proudly took credit for the heinous attack. But one of the victims and his wife, as well as the family of a deceased victim, blame Iran for the incursion too. So they brought suit against Iran, attesting it violated the Foreign Sovereign Immunities Act (FSIA) by materially supporting an extrajudicial killing.

Iran failed to appear and defend itself, and Plaintiffs now move for default judgment and damages. Plaintiffs have shown that the Court has subject matter and personal jurisdiction under the FSIA terrorism exception. And most have proven their entitlement to damages, although one Plaintiff failed to state a claim for which relief can be granted to her. The Court thus will grant Plaintiffs' Motion for Default Judgment in part and award damages to the extent allowed by law.

### I.

### A.

The Intercontinental Hotel in Kabul is a point of national pride but also a target of terrorist ire. A popular venue, it serves as a frequent meeting space for Afghan dignitaries and Western diplomats, businessmen, journalists, and tourists alike. Compl. ¶ 49, ECF No. 1. Yet,

its international allure has drawn the wrath of those who would prefer an end to Western influence, notably, the Taliban, which made the hotel a recurring target.  *Id.*

On the night of January 20, 2018, Plaintiff Shawn Kenny was serving as a security guard at the hotel.  Compl. ¶ 58; Shawn Kenny Decl. ¶ 5, ECF No. 22-3.  An American citizen and former U.S. Army infantry soldier, Shawn[1] had retired to his room after a day of work when he heard automatic rifle fire and an explosion coming from the lobby.  Compl. ¶ 57, 58; S. Kenny Decl. ¶ 5.  He armed himself and rushed to the tumult downstairs, where he encountered a pack of terrorists.  S. Kenny Decl. ¶ 5.  Immediately, he began to sustain fire from both sides.  Compl. ¶ 58; S. Kenny Decl. ¶ 5.  So began a siege of the hotel by the Afghan Taliban that reportedly lasted between 12 and 17 hours.  Exp. Rep. of Dr. Daveed Gartenstein-Ross (Gartenstein-Ross Rep.), ECF No. 22-2, at 50.[2]

The terrorists shot their way into the hotel after sneaking through a VIP entrance and murdering security guards.  Gartenstein-Ross Rep. at 49.  Once inside, they began a shooting spree in the hotel restaurant, killing two children off the bat.  *Id.*  Guests panicked and fled, hiding in their rooms or fashioning makeshift ladders out of bedsheets to climb out of their windows.  *Id.*  The terrorists were armed with suicide vests and AK-47s, as well as hand grenades and rocket-propelled grenade launchers.  *Id.* at 43, 49.  As they stormed the property,

---

[1] To avoid confusion, the Court will use Plaintiffs' first names, as many share last names.

[2] Plaintiffs rely on the expert report of Dr. Daveed Gartenstein-Ross for much of their evidence. Reliance on expert reports is typical in FSIA cases, since "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020).  The Court has reviewed Dr. Gartenstein-Ross's credentials and is persuaded he is qualified to offer the opinions discussed.  *Accord Selig v. Islamic Repub. of Iran*, 573 F. Supp. 3d 40, 51 n.1 (D.D.C. 2021) (crediting Dr. Gartenstein-Ross).

one shouted, "Where are the foreigners?"  Compl. ¶ 52.  The sound of Taliban war songs from portable sound systems they carried echoed through the hotel's hallways.  *Id.*

Shawn bravely navigated the nightmare.  Along with his fellow security guards, he moved through the building, now ablaze and thick with smoke, dodging grenades and guiding guests to safety.  S. Kenny Decl. ¶ 6.  Not everyone, though, would be saved.  According to one of Shawn's colleagues, "[t]he terrorists were going room to room.  We could hear the sound of crying then, bang, a gunshot and silence.  Then again a few minutes later, the sound of crying or yelling, then a gunshot, and silence."  Decl. Tamas Bedei, ECF No. 22-9, ¶ 6.  Estimates of the dead ranged from 18 to 43, with many more injured.  Gartenstein-Ross Rep. at 50.

One of the deceased was Glenn Selig, a fifty-year-old American who was staying at the hotel to participate in a project promoting Afghani democracy.  Compl. ¶ 54–55.  Glenn's mother, sister, and the estate of his father are Plaintiffs here.  *Id.* ¶ 4.  Glenn was an award-winning investigative reporter, broadcast journalist, and television news anchor, and he owned a successful public relations firm.  *Id.* ¶ 54.  He left behind two children.  *Id.*

The Afghan Taliban immediately claimed responsibility for the attack, stating that "by the grace of Allah, dozens were eliminated and wounded among followers of the occupying states and their agents."  Gartenstein-Ross Rep. at 52.  The Taliban's statement made clear that it deliberately targeted Afghan government officials, Americans, and other members of the International Security Assistance Force (the NATO-led military mission in Afghanistan).  *Id.* at 55.  Government officials in the United States and Afghanistan quickly acknowledged and condemned the Taliban's culpability.  *Id.* at 54.

**B**.

How this tragedy came to be, and Iran's role in the matter, requires a bit of backing up. While this opinion briefly chronicles the relationship between the Iranian government and the Taliban, the Court thoroughly examined that relationship in *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021).  That case concerned the same 2018 attack at the Kabul Intercontinental Hotel at issue here, and Plaintiffs here rely on the same expert report that the plaintiffs submitted in *Selig*.  The parties are also closely related.  That case involved the estate of Glenn, his wife, and his children.  This case involves Glenn's parents and sister.  Because of the factual overlap and without objection, the Court takes judicial notice of the facts presented in *Selig* because they "can be accurately and readily determined from [a] source[] whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see also Rimkus v. Islamic Repub. of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) ("Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have . . . frequently taken judicial notice of earlier, related proceedings."); *Harrison v. Repub. of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("[W]hen a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.") (cleaned up).

To recap what the Court established in *Selig*:  The Taliban is a Sunni militant organization that rose to power in Afghanistan at the turn of the twentieth century in the wake of a national civil war.  Gartenstein-Ross Rep. at 8–9.  But it would not maintain its control over the region for long.  The Taliban's explicit refusal to release al-Qaeda leader Osama bin Laden to the United States, even after the al-Qaeda-led terrorist attacks of September 11, precipitated the American

invasion of Afghanistan in 2001.  *Id.* at 13.  Within weeks, the United States drove the Taliban out of Kabul and toppled the regime.  *Id.* at 12–13.

The Taliban carried out no fewer than 32 attacks in the capital city before regaining control in 2021.  *Id.* at 17; Matthieu Aikins, *Inside the Fall of Kabul*, N.Y Times Mag. (Dec. 10, 2021), https://www.nytimes.com/2021/12/10/magazine/fall-of-kabul-afghanistan.html.  Often, these assaults were aimed at locations frequented by foreigners and government officials.  *Id.*  The offensives reflected two "core pillars of the Taliban's ideology: opposition to Western influence, and a willingness to use violence to realize its ideological vision."  *Id.* at 8–9.

The Taliban receives significant support from an unlikely ally: Iran.  Unlikely, seeing as "Iran is a Shia theocracy, while the Taliban is an ardently Sunni militant group that perceives Shia Islam as heretical."  *Id.* at 38.  But the United States' invasion of Afghanistan changed the calculus for Iran.  By then, the United States had become involved with two of Iran's immediate neighbors—it is sandwiched between Afghanistan and Iraq—and Iran was feeling the heat.  *Id.*  It saw supporting the Taliban, "the primary adversary of the United States in Afghanistan," *id.* at 8, as a "means of self-preservation" and "a way to raise the cost of [American] intervention in Afghanistan," and, by extension, Iran itself, *id.* at 38–39.

And so the improbable conspiracy was born.  The government of Iran and the Islamic Revolutionary Guards Corps (IRGC) have provided support to the Taliban in the form of "arms, finance, training, equipment, safe passage and safe harbor" for years.  Compl. ¶ 75.  The Taliban maintains official operations in Iranian cities, and Taliban leaders often liaise with high-ranking Iranian operatives.  Gartenstein-Ross Rep. at 31.  Taliban fighters are offered hideouts in Iran and furnished with necessities.  *Id.* at 32.  More, Taliban leaders are trained extensively by the "elite special operations unit" of the IRGC, the Qods Force, within the borders of Iran.  Compl. ¶ 6.

According to the State Department, the Qods Force has "provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."  Gartenstein-Ross Rep. at 32.  And "Iran has provided the Taliban with a consistent stream of weaponry, including sophisticated weapons capable of targeting American planes and tanks," for "well over a decade."  *Id.* at 35.

But Iran's role has not merely been one of patronage.  Its government and armed forces have also "played an active role in planning and executing some Taliban attacks, including attacks in Kabul."  *Id.* at 37.  In sum, a shared disdain for Western influence created a robust, though unexpected, partnership between Iran and the Taliban.

## C.

Survivors and relatives sued the Islamic Republic of Iran and the IRGC (collectively, Iran) for the hotel attack.  Plaintiffs here are Shawn Kenny and his wife, Oksana Kenny; the Estate of Herbert Selig, Glenn Selig's father; Lucille Selig, Glenn Selig's mother; and Jill Lasman, Glenn Selig's sister.  Compl. ¶ 4–5.  Plaintiffs filed suit in 2022, claiming Iran was liable to them for an array of damages under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*

Iran failed to appear, and the Clerk of Court entered default.  *See* Clerk's Entry of Default, ECF No. 21.  The Court then ordered Plaintiffs to file a Motion for Default Judgment. Min. Order Jan. 24, 2024.  Plaintiffs did so, and it is now ripe.  Pls.' Mot. Default J., ECF No. 22.

## II.

While a court may enter a default judgment against a party who fails to appear, such entry "is not automatic."  Fed R. Civ. P. 55(b)(2); *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The Court must first assure itself that it both has subject matter jurisdiction over the action and

personal jurisdiction over the parties. *M.M. v. Islamic Repub. of Iran*, 708 F. Supp. 3d 22, 39 (D.D.C. 2023); *Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).

Default judgment against a foreign state triggers some special rules. These rules come from the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.*, which provides the "sole basis for obtaining jurisdiction over a foreign state" in American courts. *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Generally, foreign governments enjoy sovereign immunity from the jurisdiction of federal courts. 28 U.S.C. § 1604. Yet there are several exceptions to this overarching principle, which, if applicable, both abrogate immunity and bestow a court with subject matter jurisdiction. *Id.* § 1605(a); *see Bolivarian Repub. of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 177 (2017) ("Foreign sovereign immunity is jurisdictional in this case because explicit statutory language makes it so.").

The exception to know here is the "terrorism exception." 28 U.S.C. § 1605A; *Mohammadi v. Islamic Repub. of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015). This provision furnishes subject matter jurisdiction over cases in which plaintiffs seek damages for personal injury or death caused by "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" that was "engaged in by an official, employee, or agent" of a foreign country. 28 U.S.C. § 1605A(a)(1). As relevant here, plaintiffs must also show that, at the time of the act, (i) the foreign country was designated "a state sponsor of terrorism," and (ii) the "claimant or the victim" was a "national of the United States." *Id.* § 1605A(a)(2).[3]

---

[3] Plaintiffs need not show they have "afforded [Iran] a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration" because the Intercontinental terrorist attack did not "occur[] in [Iran]." 28 U.S.C. § 1605A(a)(2).

Once the Court is satisfied it has subject matter jurisdiction, it checks for personal jurisdiction.  Under the FSIA, "personal jurisdiction exists wherever the Court has subject matter jurisdiction and a plaintiff has effected service as required in 28 U.S.C. § 1608."  *Selig*, 573 F. Supp. 3d at 62; *see* 28 U.S.C. § 1330(b).

If the jurisdictional hurdles are cleared, the Court turns to the merits.  Plaintiffs have two avenues by which to bring claims against foreign governments.  Certain plaintiffs can proceed under the federal cause of action provided in the FSIA itself.  *See* 28 U.S.C. § 1605A(c)(1)-(4). Other plaintiffs can still benefit from the FSIA's waiver of sovereign immunity and grant of subject matter jurisdiction, but they must proceed under a preexisting theory of liability, like state tort law.  *Owens v. Repub. of Sudan*, 864 F.3d 751, 809 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 140 S. Ct. 1601 (2020).  Whichever route a plaintiff takes, if a court determines that he has "establishe[d] his claim or right to relief by evidence satisfactory to the court," it goes on to award him the proper damages.  28 U.S.C. § 1608(e).

### III.

So the Court takes each issue in turn: subject matter jurisdiction; personal jurisdiction; merits; damages.

### A.

Start with subject matter jurisdiction and its concomitant abrogation of sovereign immunity.  To show that the terrorism exception applies, and thereby overcome the FSIA's "presumption of immunity," plaintiffs must make two threshold showings.  *Bell Helicopter Textron, Inc. v. Islamic Repub. of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  First, the claimants or victims must have been nationals of the United States, members of the armed forces, or federal employees or contractors when the act of terrorism took place.  28 U.S.C.

§ 1605A(a)(2)(A)(ii).  Plaintiffs satisfy this requirement:  Both of the immediate victims of the terrorist attack—Shawn and Glenn—were United States nationals in January 2018.  Compl. ¶ 14.

Second, the defendant "must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit)." *Schwartz v. Islamic Repub. of Iran*, 2020 WL 7042842, at *10 (D.D.C. Nov. 30, 2020).  Again, Plaintiffs make this showing.  Iran was designated a state sponsor of terrorism by the U.S. State Department in 1984, and this designation has remained in effect ever since.  Compl. ¶ 21; *Selig*, 573 F. Supp. 3d at 59.  Likewise, the Qods Force was designated a state sponsor of terrorism by the U.S. Department of the Treasury in 2007, and the IRGC was so designated in 2017.  Compl. ¶ 27–28; *Selig*, 573 F. Supp. 3d at 59.

Threshold requirements satisfied, the Court now moves to the core of the terrorism exception.  To use this exception, Plaintiffs must show they are seeking "money damages . . . against a foreign state" to recover "for personal injury or death" that was "caused by" the "provision of material support or resources" for an "extrajudicial killing" that was "engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency."  28 U.S.C. § 1605A(a)(1).

Part of this is straightforward.  The Plaintiffs are seeking money damages against Iran, Compl. ¶ 116, for casualty and suffering resulting from the attack on the Intercontinental Hotel. *Id.* ¶ 2.  With that established, the Court is left to assess whether the Plaintiffs' harm was caused by an extrajudicial killing for which Iran provided official material support.

**1.**

*First*, was the attack an extrajudicial killing?  The term "extrajudicial killing" has the same meaning as that given in the Torture Victim Protection Act of 1991 (TVPA).  28 U.S.C. § 1605A(h)(7).  The TVPA defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  106 Stat. at 73 (codified at 28 U.S.C. § 1350 note).  This definition is tripartite: (a) there was a killing; (b) it was deliberated; and (c) it was not authorized by a previous judgment pronounced by a regularly constituted court.  *Owens*, 864 F.3d at 770.

The attack on the Intercontinental Hotel constituted a "killing."  The Taliban murdered up to 43 individuals during the attack.  Any terrorist attack that results in death of innocent victims, even if the Plaintiffs themselves were merely injured, can serve as the basis for recovery under § 1605A.  *Schwartz*, 2020 WL 7042842, at *12; *see also Borochov v. Islamic Repub. of Iran*, 94 F.4th 1053, 1061 (D.C. Cir. 2024).

This attack was also deliberated.  The intricate planning behind the attack, exemplified by the terrorists' access to restricted areas and the Taliban's admission that the siege had been delayed to avoid striking a wedding, show that the incident was "premeditated" and "undertaken with studied consideration and purpose."  *Selig*, 573 F. Supp. 3d at 60.

Finally, the attack was not authorized by a previous judicial decree.  This element requires Plaintiffs to demonstrate that the killing occurred "without due process."  *Han Kim v. Democratic People's Repub. of Korea*, 774 F.3d 1044, 1050 (D.C. Cir. 2014).  Plaintiffs meet this burden, as "[t]here is no question that th[is] act[] of terrorism lacked the traditional protections of due process."  *Selig*, 573 F. Supp. 3d at 60–61.

**2.**

*Next*, did Iran provide official material support to the Taliban to carry out its terrorist activities?  The FSIA defines "material support or resources" by reference to the criminal material support statute.  28 U.S.C. § 1605A(h)(3).  There, it is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials."  18 U.S.C. § 2339A(b)(1).

No question, Iran materially supported the Taliban.  Recall that Iran has provided the Taliban with "wide-ranging and substantial" backing for years.  *See supra* Part I.B; Gartenstein-Ross Rep. at 40.  Iran has "provided the Taliban with a safe haven to regroup"; "helped recruit Taliban fighters and provided those recruits, as well as other Taliban combatants, with combat training"; "provided the Taliban sophisticated weapons"; "provided direct combat support, including embedded commandos, and attack planning to the Taliban"; and "incentivized the Taliban to kill Americans."  Gartenstein-Ross Rep. at 40.

More, this aid was provided through official channels.  As Dr. Gartenstein-Ross describes, "Iran's support for the Taliban is not merely the work of a few rogue Iranian agents or Taliban commanders, but rather has been coordinated at high levels."  *Id.* at 31.  So Plaintiffs have shown that Iran has provided "material support" to the Taliban through "an official, employee, or agent of [Iran]" who was "acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1); *accord Selig*, 573 F. Supp. 3d at 61.

**3.**

*Finally*, did Iran's material support of the Taliban's activities cause Plaintiffs' personal injuries?  Plaintiffs claim a range of injuries caused by the Intercontinental Attack.  Shawn claims he was "physically, mentally and emotionally injured during the attack."  Pls.' Mem. Supp. Mot. Default J. at 23, ECF No. 22-1.  And his wife asserts she "has suffered severe emotional distress not knowing during the Attack whether her husband had survived and then coping with his recovery as he has battled his injuries, including post-traumatic stress disorder." *Id.*  Glenn's family members also allege they "have suffered extreme emotional injuries" as a result of his death in the attack.  *Id.*

The FSIA requires Plaintiffs to show that Iran's actions proximately caused their injuries. *Owens*, 864 F.3d at 798.  "Proximate cause requires some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  *Id.* at 794 (cleaned up).  To demonstrate such a "reasonable connection," Plaintiffs need to "show both that the defendant's actions were a substantial factor in the sequence of events that led to their injury and that their injury must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."  *Selig*, 573 F. Supp. 3d at 61 (cleaned up).

While Dr. Gartenstein-Ross acknowledges that "it is difficult to precisely determine the full impact of Iran's support for the Taliban," Gartenstein-Ross Rep. at 40, and "he does not tie the provision of specific support from the Iran and the IRGC to the [] hotel attack[]," *Selig* at 61, he does emphasize that "the Taliban would be a less lethal and effective fighting force without Iranian support."  Gartenstein-Ross Rep. at 40.  This is sufficient.  "[B]ecause financial support and material aid are fungible . . . it is enough for Plaintiffs to have shown that Iran's financial and military aid to [the Taliban] played a significant role in aiding its operational capacity."

*Schwartz*, 2020 WL 7042842, at *14.  With Iran's help, the Taliban became stronger and more capable of carrying out attacks like the one at the Intercontinental Hotel.  So Iran's material support was a substantial factor prompting Plaintiffs' harm.  *Selig*, 573 F. Supp. 3d at 61 ("The Court is persuaded that Iran and the IRGC were key to the [] hotel attack[].").

This harm was also the reasonably foreseeable result of such aid.  Iran was providing direct funding, training, and weapons so that the Taliban could wage violence in Afghanistan.  Gartenstein-Ross Rep. at 40.  Indeed, "[t]he Taliban . . . had a long history of planning attacks in and around Kabul."  *Selig*, 573 F. Supp. 3d at 61.  So "Iran could not have provided the material support it did without an awareness of how its support would be used"—and the fallout that would ensue.  *Id.*  The natural consequence of supporting violence is death, injury, and suffering.  Not merely to the direct victims of the attacks, but also to their loved ones.

* * *

In sum, Plaintiffs demonstrate they may invoke the terrorism exception under the FSIA.  Iran's presumption of sovereign immunity is abrogated, and the Court has subject matter jurisdiction over this action.

**B.**

Next, personal jurisdiction.  Because the Court has subject matter jurisdiction, Plaintiffs must show they effected service as required by 28 U.S.C. § 1608.  *See* 28 U.S.C. § 1330(b).  Plaintiffs properly complied with § 1608(a)(4) by enlisting the aid of the U.S. State Department to assist with service "through diplomatic channels."  Affs. Req. Foreign Mailing, ECF Nos. 14

& 15.[4]  Service documents were delivered to the Iranian Ministry of Foreign Affairs on June 20,

2023.  Return of Service Aff., ECF No. 19.  This gives the Court personal jurisdiction over Iran.

**C.**

With jurisdiction addressed, the Court now turns to the merits.

All Plaintiffs advance claims under the FSIA's private right of action.  Compl. ¶ 107–10.

But this route is not open to everyone.  Claimants entitled to proceed directly under FSIA are

limited to those who are "national[s] of the United States"; "member[s] of the armed forces";

federal employees or contractors; or the legal representatives of the foregoing.  20 U.S.C.

§ 1605A(c).  Once a claimant shows he may proceed via the FSIA's private right of action, his

path to recovering damages is straightforward: any foreign state "that is or was a state sponsor of

terrorism . . . shall be liable" for the claimant's "personal injury or death."  *Id.*

Shawn and the Selig family may invoke the private right of action, as they are United

States citizens.  Compl. ¶ 15, 17–19; Pls.' Mem. Supp. Mot. Default J. at 24.  And under that

provision, they prevail.  The Court has already found that Iran is "a state sponsor of terrorism."

20 U.S.C. § 1605A(c); *see supra* Part III.A.  So the command of FSIA is clear:  Iran "shall be

liable" to these plaintiffs for their "personal injury."  20 U.S.C. § 1605A(c).

But Oksana may not follow along.  As an Uzbekistani national, Oksana does not qualify

for FSIA private right of action.  Oksana Kenny Decl. ¶ 2, ECF No. 22-4; *see M.M.*, 708 F. Supp.

3d at 46–47 ("Because [plaintiffs] lack access to the cause of action in § 1605A(c), they must

---

[4]  Plaintiffs first proceeded under 28 U.S.C. § 1608(a)(3) to serve Defendants via the U.S. Postal Service.  *See* ECF Nos. 11 & 12; 28 U.S.C. § 1608 (providing four methods of service in preferential order); *M.M.*, 708 F. Supp. 3d at 45 ("Plaintiffs could not use the first two routes because the United States and Iran lack a special arrangement for service of process, and Iran is not party to an international convention on service of judicial documents." (cleaned up)).  But U.S.P.S could not confirm that service was effected.  *See* ECF No. 13.  So Plaintiffs were entitled to proceed under § 1608(a)(4).

rely on state or foreign law for their cause of action.").  So Oksana has not pled a viable cause of action under FSIA, and her Complaint invokes no other cause of action.

Oksana tries to avoid the snafu by invoking Federal Rule of Civil Procedure 15(b)(2). Her fated argument goes as follows:  Because she raised a claim under state tort law in her Motion for Default Judgment, that claim "must be treated in all respect as if raised in the pleadings."  Pls.' Mem. Supp. Mot. Default J. at 28, n.6 (quoting Fed. R. Civ. P. 15(b)(2)).  So, essentially, the Court can copy-paste that state tort law claim into the original Complaint and consider it here.

But that is not how Rule 15(b)(2) works.  That provision provides for the later incorporation of omitted issues "tried by the parties' express or implied consent."  Fed. R. Civ. P. 15(b)(2).  Even putting aside the notion that a motion for default judgment may not be a "tri[al]" as demanded by the rule, *id.*, the Court searches in vain for evidence of Iran's consent to the added claim.  It is hard to see how Iran could have consented to the state tort law claim before entry of default when it had no notice of it from the Complaint.  *In re Fustolo*, 896 F.3d 76, 86 (1st Cir. 2018) ("Simply put, one cannot give implied consent to litigate a claim for which he or she is not provided notice."); *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1339 (11th Cir. 2020) ("Implied consent under Rule 15(b) will not be found . . . if the defendant had no notice of the new issue.").

More, Rule 5(a)(2) requires a party to serve any amended complaint raising new claims on a defaulting party.  Fed. R. Civ. P. 5(a)(2).  To "hold[] that where a defendant has defaulted a plaintiff may substantively amend a complaint pursuant to Rule 15(b)(2) merely by providing additional evidence to the Court would render Rule 5(a)(2) a nullity."  *Mwani v. Al Qaeda*, 600 F. Supp. 3d 36, 53 (D.D.C. 2022).  In short, then, Oksana cannot go straight to a motion for default

judgment and skip the crucial step of filing an amended complaint.  But this is precisely what she seeks to do:  Oksana has not sought leave to file any amended complaint.  Recognizing the newfound claim would defy Rules 15(b) and 5(a)(2).

Finally, Oksana's attempt to raise a claim for the first time at this stage departs from Rule 54(c).  That Rule is clear: "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P. 54(c).  But Oksana brings forth an entire new theory of liability on default posture.  The Court cannot depart from the pleadings so dramatically at this point.  *Accord Frost v. Islamic Repub. of Iran*, 419 F. Supp. 3d 112, 116 (D.D.C. 2020); *Henkin v. Islamic Repub. of Iran*, 2021 WL 2914036, at *10 (D.D.C. July 12, 2021).  In sum, Oksana has failed to state a viable claim for relief.

### D.

The Court now turns to an assessment of compensatory damages for Shawn and the Selig family.  These Plaintiffs must "prove that the consequences of the defendants' acts were reasonably certain to occur" as well as "prove the amount of damages by a reasonable estimate." *Abedini v. Gov't of Islamic Repub. of Iran*, 422 F. Supp. 3d 118, 136 (D.D.C. 2019).  Recall that the harms to Plaintiffs were reasonably foreseeable.  *See supra* Part III.A.3.  So the question becomes whether Plaintiffs have proven their damages by reasonable estimates.

The Court acknowledges that it is "undeniably difficult to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved."  *Valencia v. Islamic Repub. of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C. 2010) (cleaned up).  And care must be taken to "ensur[e] that individuals with similar injuries receive similar awards."  *Taitt v. Islamic Repub. of Iran*, 664 F. Supp. 3d 63, 91 (D.D.C. 2023) (cleaned up).  To accomplish the delicate task, courts in this district have

developed a general framework to use as a guide.  *See Valore v. Islamic Repub. of Iran*, 700 F.

Supp. 2d 52, 84 (D.D.C. 2010).  This scheme, known as the *Heiser* framework, serves as a useful

(albeit, nonbinding) blueprint for damages estimations.  *Fraenkel v. Islamic Repub. of Iran*, 892

F.3d 348, 361–62 (D.C. Cir. 2018).  This framework provides baseline figures but permits courts

to depart from those numbers based on the individual circumstances of the case.  *Id.*

### 1.

First, Shawn.  He seeks $5 million in recompense "for the physical, and severe mental

and emotional injuries inflicted on him in the Attack."  Pls.' Mem. Supp. Mot. Default J. at 27.

Damages for surviving victims of terrorist attacks are determined based on factors including "the

severity of the pain immediately following the injury, the length of hospitalization, and the extent

of the impairment that will remain with the victim for the rest of his or her life."  *Force v. Islamic*

*Repub. of Iran*, 617 F. Supp. 3d 20, 33 (D.D.C. 2022).  Courts have adopted a baseline of $5

million for those "suffering severe physical injuries," like "compound fractures, serious flesh

wounds, and scars from shrapnel, as well as lasting and severe psychological pain."  *Id.; see also*

*Murphy v. Islamic Repub. of Iran,* 740 F. Supp. 2d 51, 77 (D.D.C. 2010) (awarding baseline

damages where victim suffered "severe muscle and nerve damage," was "riddled with shrapnel,"

lost feeling in his leg, requiring "the assistance of a cane, walker, or wheelchair for mobility,"

and "suffer[ed] from depression and post-traumatic stress disorder."); *Taitt*, 664 F. Supp. 3d at 98

(awarding baseline damages where victim "suffer[ed] from post-traumatic migraines with

tension headaches and PTSD resulting in insomnia, nightmares, anxiety, depression, and

hypervigilance.").

Courts sometimes adjust upwards to the $7 to $12 million range in the most "severe

instances of physical and psychological pain."  *Taitt*, 664 F. Supp. 3d at 92*; see, e.g.*, *Valore*, 700

F. Supp. 2d at 84 (granting an upward departure to $7.5 million where plaintiff wakened after an explosion "to find his skin hanging from his body; severe hole-like wounds passing through his chest; pieces of metal, concrete, and glass embedded in his body; and his leg split open").  But a court should adjust downwards where victims suffered only minor physical injuries or primarily emotional harms.  *Valore*, 700 F. Supp. 2d at 84 (adjusting downwards to $1.5 million where plaintiff was not "seriously physically injured" and whose harms were better classified as "severe emotional injuries."); *Taitt*, 664 F. Supp. 3d at 111 (adjusting downwards to $4.75 million where victim suffered "rotator cuff strains in both shoulders" and "left and right knee osteoarthritis, Obstructive Sleep Apnea, and PTSD.")

During the ambush, Shawn suffered harm to his throat and lungs, as the Taliban "us[ed] an extreme accelerant to set the building ablaze," S. Kenny Decl. ¶ 7, which "produced a lot of thick smoke that . . . seemed like it was full of chemicals," Bedei Decl. ¶ 4.  Shawn was thus "forced to breathe hot, acrid smoke" for a "prolonged period," all the while inhaling tear gas.  S. Kenny Decl. ¶¶ 6, 11.  During the siege, Shawn also spent a long time outdoors in below-freezing temperatures, exacerbating the harm to his lungs.  *Id.* ¶ 7.  An onlooker reported that Shawn was "struggling to breathe, and coughing and hacking."  Bedei Decl. ¶ 4.  The president of the hospital that treated Shawn following the attack concluded that Shawn's "acute broncho-pneumonia, and [] symptoms of shortness of breath, dry heavy cough, chest burning, headache and fatigue . . . are caused by his smoke inhalation combined with physical and mental exhaustion and exposure to cold in the attack."  Decl. of Dr. Gran Zwan ¶ 7, ECF No. 22-7.

Shawn also suffered damage to his ears and hearing, as he was not wearing ear protection during the attack and was made to endure prolonged and "deafening" fire and explosions in confined areas.  S. Kenny Decl. ¶ 5.  Since the attack, Shawn has suffered hearing loss and

"chronic ringing" in his ears.  *Id.* ¶¶ 16, 17.  He testifies that "[n]ever-ending ear ringing and pressure headaches keep [him] in a mental fog the majority of [his] waking day, and make it very hard for [him] to concentrate on even the smallest task."  *Id.* ¶ 16.  And the event exacerbated preexisting injuries to Shawn's feet and ankles.  *Id.* ¶¶ 11, 20.

Shawn also reports emotional damage.  He had gotten to know many individuals in the hotel who were murdered by the Taliban, and he recounts that they "visit [him] in [his] dreams, except [his] dreams become horrible nightmares of the screams."  *Id.* ¶ 9.  He suffers from "chronic nightmares or insomnia, deep depression, extreme anxiety, an urge to isolate from other people, paranoia, a loss of ambition, a loss of interest in [his] career and life, [and] anger management issues."  *Id.* ¶ 16.  Oksana corroborates her husband's change in demeanor.  O. Kenny Decl. ¶ 16 ("He says that his life ended on January 20, 2018 . . . . He is a shell of himself.").  So does Shawn's trusted confidante, his aunt.  Mary Ann Dillhoff Decl. ¶ 3, ECF No. 22-10 ("He is withdrawn, distant and uninterested in life. He seems defeated.").  His "conflict with fellow employees and supervisors, and anxiety, and insecurity when driving" due to his newfound hearing problems rendered him unable to maintain his employment as a truck driver, and he was "forced to file for Chapter 13 bankruptcy in 2022."  S. Kenny Decl. ¶ 17.

In short, Shawn has suffered prolonged physical and emotional harm entitling him to a baseline award of $5 million.  True, the full extent of his injuries may not be visible to the naked eye.  So his entitlement to damages rests somewhere on the border between a downward variance and a baseline award.  *Compare Taitt*, 664 F. Supp. 3d at 98, 111.  The nature of his physical injuries alone would not justify $5 million in damages.  But the sheer extent of personal consequences brought on by the attack, coupled with his physical injuries, warrants the baseline

Case 1:22-cv-03299-TNM   Document 23   Filed 09/26/24   Page 20 of 24

award.  Beyond the physical injuries, he lost his livelihood, financial viability, and emotional stability.  The Court would be remiss to consider these harms in silo.

**2.**

Next, the family of Glenn Selig.  Under the *Heiser* framework, the baseline damages award for parents of deceased victims is $5 million and for siblings it is $2.5 million.  *Ewan v. Islamic Repub. of Iran*, 466 F. Supp. 3d 236, 249 (D.D.C. 2020).

Upward departures are warranted for "an unusual circumstance beyond the ordinary anguish that results from losing a family member."  *Selig*, 573 F. Supp. 3d at 66; *see, e.g.*, *Ben-Yishai v. Syrian Arab Repub.*, 642 F. Supp. 3d 110, 132 (D.D.C. 2022) (awarding upward departure to parents of victim who had "first-hand observations and vivid memories of their daughter's lifeless body shortly" after the attack; suffered a miscarriage; and were diagnosed with PTSD); *Braun v. Islamic Repub. of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (awarding upward departure to parents who "suffer[ed] the heightened anguish of not only losing a three-month old child, but having first-hand observations and acute memories of the child's death," as they were present at the scene of the attack).

Downward departures come into play when a court finds that the relationship between the family member and victim was strained or was otherwise diminished.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 86–87 (departing downwards by 50% where brother of surviving victim "did not visit his injured brother for two years after the attack" and had an "attenuated" relationship with his brother.).

Both the estate of Herbert Selig and Lucille Selig seek an upward adjustment of 25%, for total damages of $6.25 million.  Pls.' Mem. Supp. Mot. Default J. at 36, 38.  Jill Lasman also seeks an upward adjustment of 25% for total damages of $3.125 million.  *Id.* at 39.

20

Lucille reports that the death of her only son left a "gaping hole" in her life.  Lucille Selig Decl., ECF No. 22-5, ¶ 4.  And that death served as "the catalyst for a domino effect of significant losses in [her] life."  *Id.* ¶ 20.  She recounts watching the decline of her husband immediately after the terrorist attack, as "he lost his will to live."  *Id.* ¶ 15.  He would die a year and a half later.  *Id.* ¶ 17.  Soon after, Lucille's brother and son-in-law died, as well.  *Id.* ¶ 19.  The rapid death of four men whom she "loved deeply" was "devastating" for Lucille.  *Id.*  Lucille "reacted to the grief and worry with high blood pressure."  *Id.* ¶ 17.  The Court finds that Lucille's anguish, while substantial, is not so unusually severe as to warrant an upward departure.  While Lucille has lost several loved ones, most of the deaths were unconnected to the terrorist attack.  Nonetheless, she has still suffered the grief of a mother who lost a son to terrorism.  The baseline award was calculated to try to compensate such grief.  The Court awards Lucille $5 million.  *Accord Roth v. Islamic Repub. of Iran*, 2023 WL 3203032, at *3 (D.D.C. May 2, 2023), *and Selig*, 573 F. Supp. 3d at 66–67.

Next, the Estate of Herbert Selig, Glenn's father.  The Selig family testifies how destructive Glenn's death was to Herbert.  His health declined in the year and a half following Glenn's passing, and the last months of his life were spent in and out of the hospital.  L. Selig Decl. ¶ 16.  Lucille reports that "[s]hortly after Glenn's murder and the stress it caused to Herb," he began to experience heart problems.  *Id.* ¶ 17.  Also, his preexisting Chronic Lymphoblastic Leukemia (CLL) "reared its ugly head," although he had been in remission for years.  *Id.* ¶ 17.  Lucille is "firmly convinced that [her] husband died of a broken heart, caused by the murder of his beloved son."  *Id.* ¶ 17.  Jill Lasman, Glenn's sister, reports similar effects on her father's health.  She states that the day she "delivered the news [of Glenn's death] was the start of [Herbert's] declining health and mental wellbeing."  Jill Lasman Decl. ¶ 11, ECF No. 22-6.

Herbert oft expressed "his lost will to live," and told his family: "I'm next." *Id.* ¶ 12. Jill agrees that her father "died of a broken heart." *Id.* ¶ 16. The Court credits this testimony and finds that Herbert's rapidly declining health and ultimate death were likely influenced by the grief of losing his son. Such a grave and unusual consequence warrants the requested upward departure. The Court awards the Estate of Herbert Selig $6.25 million.

Next, Glenn's sister, Jill Lasman. Jill describes her relationship with her brother as a very close one. The two "shared trust and admiration" and were "always there for one another." *Id.* ¶¶ 5–7. Her original will named her husband and Glenn as the "decision-makers" for her estate and her children. *Id.* ¶ 7. She was listed as trustee on Glenn's trust and made a guardian for Glenn's children in case of the death of both parents. *Id.* After Glenn's death, Jill suffered the death of her father, her uncle, and her husband, all within a span of six years, causing her "unimaginable grief." *Id.* ¶ 22. In the wake of all the tragedy, she has experienced a painful rift with her niece and nephew. *Id.* ¶ 17. Jill has developed compulsive tendencies and has sought out professional help. *Id.* ¶¶ 26–27. The Court recognizes that Jill has undergone immense suffering over the past six years. But still, an upward adjustment is unwarranted here. While her grief is profound, it is characteristic of a sister mourning the loss of her brother. And of course her grief in Glenn's passing has been multiplied by deaths not caused by Iran. The baseline damages of $2.5 million are appropriate under these circumstances.

* * *

Awarding damages to terrorist victims is, at best, a crude and ill-fitting science. But it is one the Court has sought to carry out honestly, principledly, and with consistency in mind. So while Plaintiffs' losses are immeasurable in many ways, the Court's awards must be guided by the law. The Court is also mindful that "most—if not all—people eligible for damages from a

terrorist attack have suffered the unimaginable." *Mark v. Islamic Rep. of Iran*, 626 F. Supp. 3d 16, 45 (D.D.C. 2022).

### 3.

Finally, punitive damages.  Shawn and the Selig family have a straightforward route to recovery:  the FSIA cause of action calls for awards that "may include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  The question thus becomes how much.

Plaintiffs "request an award of punitive damages equal to their aggregated compensatory damages awards."  Pls.' Mem. Supp. Mot. Default J. at 41.  The Court agrees with this measure, as "its usual practice in cases like this" is to "award punitive damages in an amount that matches compensatory damages."  *M.M.*, 708 F. Supp. 3d at 52; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513–15 (2008) (condoning a 1:1 ratio between punitive and compensatory damages); *Selig*, 573 F. Supp. 3d at 77 (explaining rationale for 1:1 ratio).  Here that comes out to $18.75 million.

Plaintiffs also seek post-judgment interest.  Pls.' Mem. Supp. Mot. Default J. at 41.  The federal post-judgment interest statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  Interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield[.]"  *Id.*  The statute also provides that "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually."  *Id.* § 1961(b). "[A]n award of post-judgment interest under this statute is mandatory, not discretionary." *Selig*, 573 F. Supp. 3d at 78.  So the Court awards post-judgment interest at the statutory rate.

**IV.**

For these reasons, Plaintiffs' Motion for Default Judgment is granted in part and denied in part.  A separate order will issue today.


Dated: September 26, 2024                    _____
                                             TREVOR N. McFADDEN, U.S.D.J.